UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAN E. MOLDEA, | |
|        Plaintiff, | |
|        v. | Case No. 18-cv-00560 (CRC) |
| MICHAEL OVITZ, | |
|        Defendant. | |

**MEMORANDUM OPINION**

This case is the contractual companion to a classic film noir tale of revenge, shifting alliances, and relationships gone bad. The Court picks up the plot at the beginning:[1] in 2002, Los Angeles-based private investigator Anthony Pellicano orchestrated an intimidation campaign against journalist Anita Busch on behalf of clients who took offense at the stories Busch was writing about them. Pellicano was arrested and convicted. Compl. ¶¶ 8, 10. The plaintiff in this case, investigative journalist Dan Moldea, partnered with Busch in 2003 to publish a book about her ordeal, id. ¶ 9, which included a hit-and-run attempt and a dead fish left on her car windshield, id. ¶ 8.

Busch also filed a civil suit in California court in 2004, naming Pellicano's then-unknown clients as defendants. Id. ¶ 11. Moldea continued to work on the book project until Busch allegedly put an end to it because the book's contents threatened to undermine her lawsuit. Id. ¶ 12. Moldea says that when he complained about all the work he'd done for free, Busch turned the tables and mounted a smear campaign against him. Id. Unlike the book project, Busch's

---

[1] As required on a motion to dismiss, the Court draws this factual background from the complaint, assuming the truth of all well-pled allegations. See Sissel v. U.S. Dep't of Health & Human Servs., 760 F.3d 1, 4 (D.C. Cir. 2014).

civil suit pressed on, and she amended her complaint in 2008 to name Hollywood talent agent Michael Ovitz (the defendant in this case) as one of Pellicano's clients. Id. ¶ 13. Ovitz, in turn, suspected Moldea might have helpful information for his defense and subpoenaed him for a deposition in August 2011. Id. ¶ 14.

Perhaps realizing that the enemy of his enemy could be a friend, Ovitz withdrew the subpoena and sent Moldea a transcript of Busch's deposition in the California case, which Moldea claims contained false and defamatory statements about him. Id. ¶ 15. In September 2011, Ovitz dispatched his attorney, Eric George, to meet with Moldea and his attorney in the District of Columbia, where Moldea lives, to negotiate a Common Interest Agreement, the contract at issue in this case. Id. at ¶ 16. The parties executed the Agreement on November 9, 2011, but George returned to D.C. in October 2015 and again in January 2017 to discuss its terms. Id.; see also Agreement, ECF No. 1-1, at 8.

According to Moldea, the "parties' respective interests were straightforward, and each are addressed in the Common Interest Agreement," Compl. ¶ 19, which he attaches to the complaint as Exhibit A. Under the terms of the Agreement, which is governed by California law, "Moldea, in lieu of sitting for a deposition . . . will provide a declaration . . . that truthfully and accurately describes certain aspects of his collaboration with Anita Busch." Agreement ¶¶ 1, 24. The information in the declaration would help Ovitz defend against Busch's lawsuit. In return, Ovitz agreed to "reimburse Moldea for any travel-related or other expenses incurred in connection with the preparation of the Declaration." Id. ¶ 2.

But according to Moldea, his aims went beyond compensation: He also "sought to end the malicious campaign waged by Busch against him, along with indemnification against further harm as a result of his cooperation with Ovitz." Compl. ¶ 21. To that end, the Agreement

2

provides that "Ovitz intends to submit [Moldea's] Declaration to counsel for Busch, together with a demand that Busch (a) dismiss the Litigation against Ovitz and (b) issue a writing to Moldea retracting, and apologizing for, Busch's deposition statements" about Moldea. Agreement ¶ 3. The Agreement continues: "Should Busch decline to issue the foregoing apology, Ovitz's counsel agrees to send a letter to Moldea that recites each of the deposition statements set forth above, and offers Ovitz's counsel's opinion that such statements are inaccurate." Id. ¶ 4. This letter was to "be submitted by Ovitz to Moldea within a reasonable time after Busch's refusal to issue the foregoing apology." Id. Finally, the Agreement includes a damages provision: "The parties agree that Moldea will suffer harm and prejudice in his personal life and professional career, equal to at least $250,000, if Ovitz's counsel fails to provide the Letter pursuant to paragraph 4." Id. ¶ 6.

Moldea claims to have "spent hundreds of hours on Ovitz-requested/related tasks," including drafting a lengthy declaration, compiling related documents, and traveling to California to testify at a hearing. Compl. ¶ 22. Ovitz's counsel attached the declaration to a summary judgment motion filed in Busch's California case on October 31, 2012. Id. ¶ 23. And eventually, Ovitz and Busch entered into settlement negotiations in January 2018. Id. ¶ 24. Sensing the end, Moldea requested that Ovitz either demand a retraction and apology from Busch or have his counsel issue the opinion letter. Id. Ovitz, through counsel, refused. Id.

Moldea responded by filing this lawsuit in March 2018. He claims that Ovitz breached the Common Interest Agreement in two ways: "by failing to demand an apology/retraction from Busch for false statements made about Moldea, as required in paragraph 3 of the Agreement" and "by failing to send a letter to Moldea that recites each of Busch's false statements, as

described in paragraph 3 of the Agreement, and offering Ovitz's counsel's [opinion] that such statements are inaccurate" as required in paragraph 4. Id. ¶¶ 28–29.

Ovitz has moved to dismiss the lawsuit on three grounds. First, he contends that the Court lacks personal jurisdiction because he resides in California and did not personally travel to Washington, D.C. for any of the negotiations. Second, he insists that Moldea's claim is time-barred because the applicable four-year statute of limitations began to run when Ovitz "submitted" the declaration in 2012 by attaching it to the motion for summary judgment and Moldea did not file suit until six years later. Finally, Ovitz asserts that Moldea has failed to state a claim because the Agreement does not explicitly *require* Ovitz to either demand a retraction and apology, or issue an opinion letter.[2]

For the reasons explained below, the Court rejects all three arguments and will deny Ovitz's motion to dismiss.

## I.  Legal Standards

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss a suit for lack of personal jurisdiction. The plaintiff bears the burden of establishing personal jurisdiction. FC Inv. Grp. LC v. IFK Mkts., Ltd., 529 F.3d 1087, 1091 (D.C. Cir. 2008). Any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990).

A defendant may move to dismiss a suit for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In analyzing such a motion, the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is

---

[2] Ovitz has withdrawn the argument that the Court should dismiss the complaint for insufficient service of process. Reply at 1 n.2.

plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The Court "must take all of the factual allegations in the complaint as true." Id. It also must "constru[e] the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006). Finally, the Court may only "consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Id. This means the Court may consider the Common Interest Agreement, which is attached to the complaint.

Rule 12(b)(6) is also "the vehicle for asserting the affirmative defense of statutory time limitation." Peart v. Latham & Watkins LLP, 985 F. Supp. 2d 72, 80 (D.D.C. 2013). "[B]ecause statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." Bregman v. Perles, 747 F.3d 873, 875–76 (D.C. Cir. 2014) (citation omitted).

## II. Analysis

### A. Personal jurisdiction

There are two types of personal jurisdiction: general and specific. General jurisdiction applies regardless of the nature of the claim but is available only where the defendant is so "at home" in the forum state that he can be sued there for any reason. Daimler AG v. Bauman, 571 U.S. 117, 137 (2014). Moldea does not argue that Ovitz, a California resident, is at home in the District of Columbia. This motion therefore concerns the second type of personal jurisdiction. "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication

5

of issues deriving from, or connected with, the very [forum-related] controversy that establishes jurisdiction." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (internal quotation marks, citation omitted).³ To establish specific personal jurisdiction, then, Moldea must make a *prima facie* showing that jurisdiction is proper under both the District of Columbia's long-arm statute and the Constitution's Due Process Clause. FC Inv. Grp. LC, 529 F.3d at 1094–95.

As relevant here, the District of Columbia's long-arm statute allows for specific personal jurisdiction over a non-resident defendant "who acts directly or by an agent, as to claims arising from the person's . . . transacting any business in the District of Columbia." D.C. Code Ann. § 13-423(a)(1). This means that to establish personal jurisdiction under the transacting-business clause, a plaintiff must make a *prima facie* showing that "[1] the defendant transacted business in the District, [2] the claim arose from that business, and [3] the business constituted minimum contacts with the District such that the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'" Thompson Hine LLP v. Smoking Everywhere Inc., 840 F. Supp. 2d 138, 142 (D.D.C. 2012), aff'd 734 F.3d 1187 (D.C. Cir. 2013) (citation omitted); see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 319 (1945). Because the transacting-business clause is "coextensive with the due process clause," Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004) (quoting Mouzavires v. Baxter, 434 A.2d 988,

---

³ Ovitz argues that Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984), forecloses personal jurisdiction here. See MTD at 8; Reply at 4–5. But Helicopteros was a case about *general* jurisdiction and thus has no bearing on whether the Court has *specific* jurisdiction over Ovitz regarding claims that arise out of his contacts with the District of Columbia. See Helicopteros, 466 U.S. at 415–16 (expressly limiting discussion to propriety of general personal jurisdiction because "[a]ll parties to the present case concede that respondents' claims against Helicol did not 'arise out of,' and are not related to, Helicol's activities within Texas").

6

992 (D.C. 1981) (per curiam)), the statutory and constitutional prongs of the personal jurisdiction inquiry often merge.

A defendant satisfies both the District's long-arm statute and due process when he "enters into a contract that has a 'substantial connection' with the forum." Id. (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). Courts have focused on a number of considerations to evaluate whether there is a "substantial connection" between the defendant's business and the District, including: (1) whether "the non-resident solicited the business relationship," Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti, 15 F. Supp. 2d 47, 51 (D.D.C. 1998) (citing Schwartz v. CDI Japan, Ltd., 938 F. Supp. 1, 6 (D.D.C. 1996); Mouzavires, 434 A.2d at 995); (2) whether negotiations took place in the District, id. (citing Abramson v. Wallace, 706 F. Supp. 1, 2 (D.D.C. 1989)); and (3) whether the contract was at least "partly performed in the District," Abramson, 706 F. Supp. at 2; Schwartz, 938 F. Supp. at 6.

These considerations easily support the exercise of specific personal jurisdiction over Ovitz. Here, Ovitz does not contest Moldea's allegation that he "dispatched his counsel to meet with Moldea and his attorneys in the District of Columbia to negotiate the parameters of a Common Interest Agreement." Compl. ¶ 16. Although Ovitz makes much of the fact that he did not personally travel to D.C. to negotiate the terms of the Agreement, the long-arm statute expressly contemplates jurisdiction over a non-resident defendant who sends an agent to do his business for him. D.C. Code Ann. § 13-423(a)(1); see also Mouzavires, 434 A.2d at 993 ("[A] nonresident defendant need not have been physically present in the District."); Schwartz, 938 F. Supp. at 6–7 ("[A] non-resident defendant may be subject to personal jurisdiction even if he has never been physically present in the forum state[.]"). According to Moldea, he and Ovitz's

counsel met in the District to discuss the terms of the Agreement in September 2011, October 2015, and January 2017. Compl. ¶ 16.

Moreover, Ovitz's contention that it was his "understanding that there [was] no need for any part of the contract to be performed in the District of Columbia," MTD Ex. 1, Ovitz Decl. at 22 ¶ 15, does not undercut personal jurisdiction. Moldea insists that he in fact performed a large part of his end of the bargain here in D.C., where he lives, by spending hundreds of hours preparing the contracted-for declaration and compiling related documents, Compl. ¶ 22. Again, Ovitz does not dispute Moldea's account. That is enough to support a finding that the contract was at least partly performed in D.C. Finally, there can be no question that Moldea's suit arises from these contacts with the forum: Ovitz sent his attorney to the District of Columbia to negotiate the Common Interest Agreement, which forms the basis of Moldea's breach-of-contract claims.

Because the Court concludes that it has specific personal jurisdiction over Ovitz based on his business transactions here in the District, it will deny Ovitz's motion to dismiss on this ground.

B. Statute of limitations

Ovitz argues in the alternative that Moldea's breach-of-contract claims are untimely under California's four-year statute of limitations. MTD at 9; Cal. Code Civ. Proc. § 337. As explained above, "a court should grant a pre-discovery motion to dismiss on limitations grounds 'only if the complaint on its face is conclusively time-barred,' and the parties do not dispute when the limitations period began." Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals, 873 F. Supp. 2d 288, 308 (D.D.C. 2012) (quoting Turner v. Afro-American Newspaper Co., 572 F. Supp. 2d 71, 72 (D.D.C. 2008)). Here, however, the parties *do* dispute

when the limitations period began to run for both the alleged breach of Ovitz's duty to demand a retraction and apology from Busch, and the alleged breach of Ovitz's duty to issue an opinion letter when that apology was not forthcoming. And, as will follow, the complaint is not on its face conclusively time-barred. The Court therefore concludes that Ovitz has not met his "heavy burden" for dismissal here. Id.

Assuming the Agreement imposes a duty on Ovitz to demand a retraction,[4] paragraph 3 of the Agreement requires Ovitz "to submit the Declaration to counsel for Busch, together with a demand that Busch (a) dismiss the Litigation against Ovitz and (b) issue a writing to Moldea retracting, and apologizing for, Busch's deposition statements." Agreement ¶ 3. Ovitz argues that the clock for the retraction demand must start on October 31, 2012, when Ovitz's counsel filed the motion for summary judgment, because Moldea himself describes attaching the declaration to that motion as "submit[ting] the Declaration." Reply at 6 (quoting Compl. ¶ 23). According to Ovitz, if he submitted the declaration on October 31, 2012, and the Agreement requires Ovitz to submit the declaration "together with" the demand, he must have been in breach that day or soon thereafter. Id. at 6–7; MTD at 9.

While Ovitz's interpretation may make some sense, it is not the only plausible one. Moldea counters that although he used the word "submitted" in the complaint, neither he nor Ovitz "believed the attachment to the Motion for Summary Judgment to constitute the specific submission to counsel required in the Common Interest Contract." Opp'n at 12. According to Moldea, because there is no evidence that Ovitz ever submitted the declaration as contemplated by the Agreement, the statute of limitations only began to run once Ovitz made clear in January

---

[4] This issue is discussed *infra* Subpart II(C).

9

2018 that he would not be demanding a retraction and apology.  See Compl. ¶ 24.  Other parts of the Agreement support Moldea's contention that the parties did not understand the word "submit" as used in the Agreement to mean "file" in the ongoing civil litigation.  First, paragraph 3 requires Ovitz to submit the declaration with two demands, one for Busch to retract her statements and apologize and the other for Busch to dismiss the lawsuit.  A motion for summary judgment might lead to the end of a case, but the motion itself is not typically considered a demand to the other litigant to dismiss the lawsuit.  Second, paragraph 7 separately covers what should happen "[s]hould the Declaration be filed for any purpose in the Litigation," suggesting that the submission contemplated in paragraph 3 was not filing the declaration in the California proceeding.

At summary judgment, Ovitz may well be able to show that Moldea's claim accrued soon after Ovitz filed a motion for summary judgment in the California proceeding and attached Moldea's declaration to that motion.  But at this stage in the litigation, the Court looks only to the complaint.  Moldea has presented a competing, plausible scenario regarding when his cause of action accrued.  Given these competing interpretations, it is not clear from the face of the complaint when the limitations period began to run.  The Court will therefore deny Ovitz's motion to dismiss Moldea's claim for breach of duty to demand the retraction as untimely.

Moving to the duty to issue an opinion letter, paragraph 4 of the Agreement requires Ovitz's counsel to send Moldea a letter refuting Busch's statements "within a reasonable time after Busch's refusal to issue the foregoing apology" as referenced in paragraph 3.  Agreement ¶ 4.  According to Moldea, the statute of limitations on Ovitz's alleged breach of paragraph 4 also began to run in January 2018, when Ovitz communicated that he would not be issuing the letter.  See Compl. ¶ 24.  If this is right, then Moldea did not sleep on his rights; instead, he filed

10

suit soon after it became clear to him that the opinion letter would not be forthcoming. Ovitz disagrees, countering that either the requirements in paragraph 4 were never triggered (because "Busch was not asked to apologize") or arose "'within a reasonable time' after Busch's failure to apologize"—which could not possibly extend to March 2014, four years before Moldea filed this lawsuit. MTD at 10. Again, both parties present conflicting scenarios regarding the statute of limitations that are both plausible and consistent with the plain language of the Agreement. Therefore, it is not clear from the face of the complaint when the statute of limitations began to run on the alleged breach of the duty to provide an opinion letter—whether it was soon after Busch failed to apologize in 2012 or when Ovitz communicated that he would not issue the letter in 2018. The Court will therefore deny Ovitz's motion to dismiss on this ground as well.

C. Failure to state a claim

Finally, Ovitz moves to dismiss for failure to state a claim upon which relief can be granted on the ground that the Common Interest Agreement does not obligate Ovitz to demand a retraction and apology, or issue an opinion letter. MTD at 10. He contends that the "plain meaning" of "intends to" in paragraph 3 is that Ovitz was under no obligation to demand a retraction or apology. Reply at 8. And, Ovitz says, he was never under any obligation to issue the opinion letter because the condition precedent to that obligation—Busch refusing to apologize in response to Ovitz's discretionary demand—never occurred. Id. at 9.

Under California law, "[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." California v. Cont'l Ins. Co., 281 P.3d 1000, 1004 (Cal. 2012) (first quoting Bank of the West v. Superior Court, 833 P.2d 545, 552 (Cal. 1992); then quoting Cal. Civ. Code § 1636). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." Id. (first quoting AIU Ins. Co. v. Superior Court, 799 P.2d

11

1253, 1265 (Cal. 1990); then quoting Cal. Civ. Code § 1636). "If the contractual language is clear and explicit, it governs." Bank of the West, 833 P.2d at 552. However, "[l]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case." Continental Ins. Co., 281 P.3d at 1004 (quoting Bank of the West, 833 P.2d at 552). In addition, "if the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Bank of the West, 833 P.2d at 552 (quoting Cal. Civil Code § 1649). Because intent is a factual determination, the Court must deny a motion to dismiss where the contractual language and context leaves doubt as to the parties' intent. See The Scowcroft Grp., Inc. v. Toreador Res. Corp., 666 F. Supp. 2d 39, 43–44 (D.D.C. 2009) (denying motion to dismiss breach of contract claim based on ambiguous contract provisions).

The Court concludes that the parties' intent is not so clear at this stage of litigation as to warrant dismissal without discovery on Moldea's claims. Starting with the written terms of the Agreement, paragraph 3 provides that "Ovitz *intends to* submit the Declaration to counsel for Busch, together with a demand that Busch" dismiss the California lawsuit and retract her statements about Moldea. Agreement ¶ 3 (emphasis added). Although the ordinary meaning of "intend" could imply a mere plan or expectation to perform,[5] other parts of the Agreement make little sense if Ovitz were not required to demand the retraction. Paragraph 4 imposes on Ovitz the obligation to issue an opinion letter "[s]hould Busch decline to issue the foregoing apology" that Ovitz "intends to" demand according to paragraph 3. Agreement ¶ 4. And paragraph 6 provides Moldea with at least $250,000 in damages in the event that Ovitz fails to fulfill the

---

[5] See, e.g., Intend, Black's Law Dictionary (10th ed. 2014) ("to have as one's purpose").

12

obligation set forth in paragraph 4.  Id. ¶ 6.  This damages provision suggests to the Court that a central purpose of the Agreement for Moldea was to receive—either from Busch herself or from Ovitz's counsel—a document refuting the negative statements Busch allegedly made about him. Indeed, Moldea pleads that he entered into the Agreement "to end the malicious campaign waged by Busch against him."  Compl. ¶ 21.  Leaving the demand for a retraction and apology entirely to Ovitz's discretion would appear to undermine that purpose and the mandatory language in paragraphs 4 and 6.

Ovitz relies on two cases in California that interpret the phrase "intends to" as conveying an expectation about the future rather than an obligation.  MTD at 11 (citing Jappa v. California, No. 08-cv-1813 WHQ (POR), 2009 WL 1396364 (S.D. Cal. May 15, 2009); People v. Jackson, 15 Cal. App. 4th 1197 (1993)).  But neither case involves questions of contract interpretation, let alone a situation where one reasonable meaning of the phrase appears to undermine the purpose of the contract as a whole.  See Jappa, 2009 WL 1396364, at *5 (concluding that plaintiff's allegation that she "intends to quit" her job as meaning she had not yet quit her job as required for failure-to-pay claim); Jackson, 15 Cal. App. 4th at 1201 (interpreting discovery rule requiring defense to disclose witnesses he "intends to call" as those he "reasonably anticipates" calling).

Ovitz also argues that he could not have breached paragraph 4 because it contains a condition precedent—that Busch decline to retract her statements and apologize—that did not occur because she was never asked to apologize.  MTD at 11.  In Ovitz's view, this means that neither he nor his counsel were ever required to send the opinion letter.  Id.  The use of "foregoing" to describe Busch's apology could be interpreted to condition the opinion letter on the outcome of paragraph 3, but that interpretation would again undermine Moldea's apparent understanding of the Agreement, which strikes the Court as a fair one when the contract is read

13

as a whole: that he would be left with either an apology and retraction from Busch herself, or an opinion letter from a reputable source refuting Busch's statements. Because the fundamental goal of contract interpretation is to give effect to the parties' intent, and the parties' intent regarding the interaction between paragraphs 3 and 4 is ambiguous, the Court will not dismiss this aspect of Moldea's claim either.

## III. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion to Dismiss. A separate Order shall accompany this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: February 6, 2019